## THE RUCHAMKIN.

### THE WASHINGTON.

Civ. Nos. 780, 953, 954, 1203, 1217–1222, 1230.

United States District Court
E. D. Virginia, Alexandria Division.
April 17, 1956.

---

Thomas F. McGovern, Department of Justice, Washington, D. C., and Harlan E. Freeman, Asst. U. S. Atty., Alexandria, Va., for the United States.

Francis N. Crenshaw (Baird, White & Lanning), Norfolk, Va., Joseph M. Brush (Thacher, Proffitt, Prizer, Crawley & Wood), New York City, for Texas Co.

Marvin Schwartz, New York City, and William P. Woolls, Jr., Alexandria, Va., Williams, Cocke & Tunstall, Norfolk, Va., James P. O'Connell, New York City, Simone N. Gazan, New York City, Bertram J. Dembo, New York City, Freedman, Landy & Lorry, Philadelphia, Pa., Greenhill & Greenhill, New York City, for death claimants.

BRYAN, District Judge.

The U. S. S. Ruchamkin and the tanker Washington, of The Texas Oil Company, collided in the Atlantic about 50 miles off the coast of Virginia, just below Cape Henry, soon after two o'clock on the morning of November 14, 1952, with resulting loss of life and personal injuries as well as damage to both ships. Throughout the night the weather was fair, the sky clear, and the wind light, with a smooth sea. A fast destroyer escort, the Navy ship was joining from the rear a formation of ten other naval vessels moving westwardly in an amphibious operation aimed at the Virginia shore. The Washington, out of a Gulf port and bound for Philadelphia, was on a northerly heading and had passed through the screen of the formation as it slowed to let her through. Previously hidden from each other by an intervening heavy vessel of the main body, the Ruchamkin and the tanker met as the tanker crossed ahead of, and as the Ruchamkin on the off side and at top speed was overtaking, the intervening ship. The present litigation consists of reciprocal libels between the United States and The Texas Company for the ship injuries, libels against the Company on the death claims, and the petition of the Texas for exoneration or limitation of liability.

On the preceding evening the flotilla had left Norfolk on a mock amphibious attack—Operation Seascape—upon Camp Pendleton, located immediately south of Virginia Beach. The task force consisted of a screen of four vessels in a "bent line" or arc protecting a main body of five heavy ships formed in a circle with a radius of 1000 yards and the flagship in the center. The chord of the screen was a stretch of five or six miles. On this night only four ships were in the screen because the Ruchamkin, though a screen vessel, was away on a sortie to retrieve a shore detachment and to return with them to the formation at midnight.

U. S. S. Fremont was the flagship and guide. In addition to her captain, she carried the Officer in Tactical Command (OTC), in charge of the entire formation. On the extreme left of the screen was the U. S. S. Corry, the Lloyd next, then the Hollis carrying the screen commander as well as her own master, and the O'Hare farthest to the right, all destroyer-type craft. The wing tip ships—the Corry and O'Hare—were stationed 5,900 yards from the guide and 75° to each side of her base course line, while the two inner screen vessels were distant 3,700 yards from the guide and, respectively, 33° to the right and left of the base course. Around the flagship were the Glynn, directly forward; the Capricornus, nearly abeam to starboard; (the Carter Hall was to have been on the Fremont's starboard quarter but was detained for repairs and never participated in the maneuvers); the San Marcos astern of the flagship; the New Kent on the port quarter; and the Newport News broad on the Fremont's port bow.

The formation steamed almost due east from the Virginia capes. Outbound the Newport News on radar picked up the Washington to the south, on a northerly course, inshore of the flotilla, and the Newport News almost constantly thereafter maintained a track on her. Originally the Navy unit planned to turn south when about 60 miles at sea, and when opposite "Point Yoke"—Camp Pendleton—to head west for the assault. Before reaching the end of the first leg, however, the OTC discovered that an aircraft carrier group was maneuvering south of him and he, therefore,

abandoned his intended course change in that direction; instead, the flotilla switched to due north at 0055. About 0115, the flotilla swung from north to west, 270°T. At 0150 again the course was changed, this time to 257°T. The last alteration was necessary to bring the group into Camp Pendleton—to compensate for the abandoned southward movement. Their speed was 14 knots.

In the meanwhile the Washington, with all regulation lights burning, was on a course of 7½°T. (9° gyro) and a speed of 14½ knots, her presence well known to the flotilla. She had passed the aircraft carriers and now saw more white lights to starboard, both forward and abeam, and some on her port bow. None seemed nearer than five miles. Save for a temporary deviation to port to give ample way to an unidentified southbound ship, she steadily maintained her course and speed.

The combat intelligence center (CIC) of the Fremont had the Washington on her radarscope at a range of 13 miles just before the flotilla changed from its 270°T. course at 0115. Other ships of the group also held the Washington. The flag did not consider her to be a threat to his formation, for he reckoned that the Washington would pass astern of the group. But when the formation changed to 257°T.—at 0150, twenty-some minutes before the accident—the Washington, then off the Fremont's port bow at a distance of ten miles, was computed to be on a collision course with the Capricornus, collision predicted at 0209. This solution was thereafter verified at short intervals, and about three minutes later the Washington was bearing 229°T. with a range of 6.7 miles from the Fremont, and next at a range of 3.9 miles, bearing 230°T. About 0202 it appeared she would pass through the center of the formation, her closest point of approach being 1700 yards from the Fremont. This information was published generally throughout the flotilla at a time when the Ruchamkin was in the area. Because of sea return or other interference, after 0202 the Washington was no longer observable on the flagship's radarscope.

At 0205 the formation's speed was reduced from 14 to 8 knots, then to 5 knots at 0207. The Washington had not yet passed through the screen. The purpose of the speed reductions was to let her through. (The clocks of the flotilla were possibly two minutes ahead of the tanker's, but the times here are those of the Navy.) On the Washington, soon after 0200, the second mate having her con saw two red lights almost dead ahead or fine on the starboard bow, "bright" and "close of me and going across my bow". Immediately he ordered the tanker to 23° gyro (21½°T.) from her base course of 9° gyro (7½°T.). The two red lights were undoubtedly the port side lights of the Hollis and the O'Hare (the vessels of the right wing of the screen). When these two red lights were well on the tanker's port bow, she went back to 9° gyro or 7½°T. She had passed between the Hollis and the Lloyd, about a half-mile from the latter, more than a mile from the Hollis, and 1200–1500 yards ahead of the Glynn, the lead-ship of the main body.

Just after he had steadied on 7½°T. and was passing the Capricornus (the main body's starboardmost ship) the mate saw another red light "very close to my starboard hand, and coming across from my starboard bow to my port bow at a terrific speed." Immediately he gave the tanker hard left rudder and sounded two blasts on her whistle, followed by several short ones. The red light was the Ruchamkin as she sped across the Washington's bow. Within seconds the vessels collided, the Washington's stem ramming the Ruchamkin a bit aft of midship. It was 0213 Washington time, possibly 0215 Ruchamkin's.

Earlier the Ruchamkin had completed her mission and had tailed the formation while it was still steaming eastwardly. About 0138 she reported to the screen commander by voice radio her readiness to join, and in reply was told to wait. At 0140 she reported her arrival to the

guide and received acknowledgment at 0155, but her message did not reach the Fremont's bridge until after the collision. She was then on the starboard quarter of the main body, bearing 65°T. from the flagship and 6,500 yards distant —she had followed around to the right of the group as it changed courses. No warning of the approach of the Washington was ever specially given to the Ruchamkin by the guide or by any other ship in the formation. Her commander testified that he had not received the reports which the Fremont had been releasing concerning the tanker. Moving with the same speed as the main body, while waiting, the Ruchamkin was next directed by the screen commander to move to a position from which, when ordered, she could assume her station in the screen—immediately to the north and right of the Hollis. The tanker was then preparing to go through the screen—on the other side of the Hollis—her course 7½°T. —then 21½°T.—then 7½°T., the Ruchamkin's 260°T.

For taking position the command to the Ruchamkin was to expedite, i. e., to hurry or move "smartly". With engines rung up to 22 knots, she coursed along the right side of the main body, almost parallel to the formation—a divergence of only 3°—and 1,000 to 1,500 yards from the nearest ship. In effect told to disregard the speed reductions, the Ruchamkin was ordered by the screen to "continue to expedite". She obeyed. Still no special warning was given her of the Washington's presence inside the screen, though she was in plain view of every vessel of the whole flotilla save the Ruchamkin. Indeed, before the Ruchamkin encountered the Washington the formation had been ordered to resume 14 knots, another assurance to the Ruchamkin that all was clear.

The intervening main body—"cargo lights, porthole lights and mast lights, or what you have from this formation"— obscured the Washington and the Ruchamkin from each other. Then on a 260° or 265°T. course and overtaking what she thought was the Carter Hall (not being advised of the latter's absence), but which in fact was the Capricornus, the Ruchamkin noticed that the next vessel, believed to be the Glynn, apparently was closing her. In truth it was the tanker, at a range of not more than 1,-000 yards. At once the Navy ship went to 270°T., then to 275°T. and then to full right rudder. Only a directional change of 28° was accomplished. She shot across the tanker's bow. Collision followed, within a minute or two from the moment the one observed the other.

Stressing that radar perception does not relax the rigor of the International Rules and insisting that the Washington was throughout the burdened vessel in a crossing situation, the United States lays blame to the tanker, in that, she did not give way to the flotilla as a unit or as separate ships. 33 U.S.C.A. § 104. Conceding the premises the tanker contends, however, and the court agrees, that neither before nor after the tanker entered the screen—the two pivotal stages of the case—did the Washington breach the right hand rule. Indeed, no transgression of any sort was committed by any vessel before the tanker passed through the screen. The cause of the collision was the Navy's breach of the special circumstances mandates of the Rules while the Washington was in the midst of the flotilla. 33 U.S.C.A. §§ 112, 121.

■ I. Assuming, as the Government asserts, that the tanker had been apprised by public notices of the Navy's plans for Seascape, she was not thereby burdened more heavily than to anticipate the appearance of the Navy ships and to avoid unnecessary interference with them. But even if it was the Washington's duty to give way to the formation —if the starboard hand rule accorded precedence to the flotilla as a whole—she had no opportunity to defer. As she stood up the coast, the Washington had passed one naval group, and if she was to expect another, nothing in the later lights revealed the arrival of a second formation. Moreover, initially the flotilla planned to move south on its first turning, and thus the tanker might reasona-

bly have believed she would escape the formation entirely.

The merchantman had before him only a maze of white lights. Well could they have marked a fishing fleet or a number of unassociated freighters. All hands agree that traffic was very thick that night. The lights were all within the customary lanes of coastwise shipping and in the routes of vessels bound for and out of the Chesapeake Bay ports. For the last hour the ships of the screen had been repeatedly altering position, as they oriented and reoriented; the main body also, though less radically. These movements aggravated the confusion of the lights. Blinker as well as light signals from the naval vessels were not intelligible to the stranger and she is not blameworthy for having gleaned nothing from them. Consequently, even if it had been the duty of the tanker to go astern of a naval formation, she had no warning she had met one.

Besides, until 0150, only slightly more than twenty minutes before the collision, the Washington was not a threat to the flotilla; as tracked she would pass astern of the group. At that late hour the guide established a collision course with the tanker by turning the flotilla to 257°T. from 270°T. To be sure, the flotilla was entitled to change course, but this alteration was just another factor rendering avoidance of the flotilla more difficult.

In this connection it must be remembered, too, that the tanker and the flotilla were meeting at less than a right angle. Also, because of the eastwardly receding curve of the southerly end of the screen arc, the tanker was not in a situation involving risk of collision with the flotilla until she was beyond the path of the southernmost ship of the screen, the Corry. Hence the tanker did not have the choice of skirting the flotilla. At all events, neither of the two left wing or southern vessels of the screen (the Corry and the Lloyd) ever tendered collision. When the tanker neared, but before she pierced the screen, both the Corry and the Lloyd, as we have seen, diminished their speed markedly. Their bearing

thus did "appreciably change" and risk of collision disappeared. As the Washington's mate said, these ships slid down his starboard hand and dropped astern of him.

■ Therefore, the tanker in not at once yielding to the flotilla—in not going astern of the Corry or the Lloyd—did not violate the right hand rule. While the OTC's decreases of speed were purposed, commendably enough, to minimize the dangers incident to the meeting, those dangers sprang principally from the Navy's desire to maintain a unified formation, a unity which demanded exclusive occupancy of almost 12 square miles of the sea at all times and which had embarrassed the Washington a limine. But having slowed his ships, the OTC intended for the tanker to continue as she did. On glimpsing the red side light of the Hollis to starboard, however, the Washington immediately righted her wheel—going from 7½°T. to 21½°T. —but returned to her original course as soon as the Hollis was away. The tanker did not attempt to pass eastwardly through the formation; the screen commander admitted that he was mistaken in so announcing to the Flotilla.

Just as the tanker's behavior before she penetrated the screen was blameless, so for entering it she is not censurable. There was no other way for her. Had she stopped or slowed she would have been enveloped by the Flotilla; had she gone astern of the Lloyd, she would have engaged the main body of the formation.

II. Furthermore, the Washington committed no fault of navigation after she moved into the field of the flotilla. When she resumed 7½°T. she was departing the formation, crossing the bow of the outermost heavy ship, the Capricornus, at a range estimated by the OTC as from 500–800 yards and by the watch of the Capricornus at 2,000–2,500 yards. Already she had cleared the Glynn, the van of the main body, by 1,200–1,500 yards. At this time the Capricornus was at five knots. (In an answer to interrogatories the Government stated that the Capricornus was a darkened ship

from midnight until 0200; but the Government asserts this was an error, and the court so finds.) Obviously the flag considered the Washington safely away as she passed the Capricornus, for he thereupon ordered the whole flotilla to resume its regular 14-knot speed.

■ The meeting of the Ruchamkin and the Washington was not controlled by the starboard hand rule, for neither vessel could see the other. Lind v. United States, 2 Cir., 1946, 156 F.2d 231, 233. There is no acceptable proof that the tanker could visually have espied the Ruchamkin, or the Ruchamkin the tanker, before the other emerged from the obstruction of the Capricornus. Wholly incredible is the testimony of the tanker's lookout that he discerned the lights of the Ruchamkin before and just after 0200, reporting them to the bridge each time, and could recognize them as the ship with which the tanker collided. The court cannot find, as does the Government, any corroboration of the lookout in the testimony of the tanker's wheelsman. There is virtual unanimity among all the watch officers that so numerous were the lights that no particular ship was distinguishable. Even the screen commander lost sight of the Washington as her lights merged with the main body's. Nor were they separable on the radarscope. With so many pips on the radarscope, the picture was like "a cluster of grapes" and individual identification almost impossible.

■ As the Ruchamkin was not in sight, the Washington was not required by Article 28, 33 U.S.C.A. § 113, to give Ruchamkin a whistle signal of the tanker's return to 7½°T. A blast then might incidentally have been helpful or it might have been confusing, but as it was not owed the Ruchamkin, its omission was not fault.

■ Governing here are the special circumstances rules, Articles 27 and 29, 33 U.S.C.A. §§ 112, 121. Both vessels exerted themselves to the utmost to avoid collision after their presence was mutually disclosed. From that moment no negligence can be laid to either. Although "right hard rudder" by the Ruchamkin might have saved her, it is doubtful; her master was acting in extremis and he must not be judged too nicely. But earlier neglect of the Navy directly and proximately accounts for the collision.

■■ No explanation is offered why the Ruchamkin did not receive and regard the advice repeatedly given the flotilla both by the OTC and by the screen commander of the tanker's progress; no reason is given why the Ruchamkin was not alert to the danger she might well anticipate from the stranger. In these respects she was negligent. Again, with the tanker proceeding between the Lloyd and the Hollis and the formation slowing to let her through, the screen commander nevertheless called the Ruchamkin to speed across the bows of the Washington, at the same time misjudging the course of the merchantman. For allowing the Ruchamkin to follow an order so plainly perilous, the OTC, too, was negligent. Though the expediting order established an obvious risk of collision, no effort was made to caution the tanker against the imminent danger. Utterly ineffectual as a signal were the flashing lights sent her from the Fremont. Delayed until the tanker was passing the Capricornus and designed only to reprimand the Washington for traversing the area, they were focused not from a nearby ship but from the flagship, a vessel encircled by other ships. Light signals that night had not been effective between the members of the naval group themselves—not even the screen commander could be raised by the Ruchamkin by lights.

■ If a private vessel, the Ruchamkin because of her negligence would be liable in rem, and her owner would be liable in personam, for the damage to the tanker. Hence here the United States must answer on both principles. Public Vessels Act, 46 U.S.C.A. § 781. Ruchamkin is also liable under the in rem principle, and the Government in personam, for the negligence of the commodore and

the screen commander. This liability is not fixed by virtue of a military chain of command; it is predicated upon what these officers did or left undone while present and in authority. Moreover, by reason of their authority to direct her moves, they were constructively aboard the Ruchamkin. As we later point out specifically, the Fremont and the Hollis are also liable under the in rem principle, and the United States in personam, for the negligence of the tactical officers respectively aboard them. No other ship in the flotilla is found guilty of tortious conduct.

The court has decided the issue of the in rem liability of the Fremont and Hollis because the Government requested a finding on this head. Each of these two vessels had her own master and the United States urges with much force and logic that, as the mistakes of the tactical officers occurred in their actions as commodore and screen commander, and not in the navigation of the ships they were aboard, these vessels are not chargeable with such negligence. Strong precedent is cited to this point. Publicover v. Alcoa S. S. Co., 2 Cir., 1948, 168 F.2d 672, 678; the Glaucus and City of Florence, 1948, Law Reports (Eng.) Probate Division 95; The Sobieski, 1949, Law Reports (Eng.) Probate Division, C.A. 313. But in all of these cases the commodore's vessel was owned by another than the employer of that officer. Moreover, in each instance he was aboard or acting in that capacity without the invitation or desire of the owner.

On the other hand, instantly the tactical officer was on board at the direction of the owner; the vessel was furnished him by the owner for his tactical duties. There is nothing inequitable in holding the owner, and the ship it provided for him, responsible for the tactical officer's conduct. In United States v. The Australia Star, 2 Cir., 1949, 172 F.2d 472, 476, the Government's escort ship was held liable for failing to give both her escortee and a stranger-vessel warning of the approach of each other. True, there the escort's master and the escort

officer were the same person; but, surely, the division of these responsibilities between two officers, instead of vesting them in one, does not destroy the principle. We find no repudiation of The Australia Star evinced in United States v. The Adrastus, 2 Cir., 1951, 190 F.2d 883.

Again, the argument of the Government would vitiate the intent of the Public Vessels Act. Its intendment is to render the United States suable and answerable for a want of care on the part of its authorized personnel in their acts upon its public vessels. Canadian Aviator v. United States, 1945, 324 U.S. 215, 224, 65 S.Ct. 639, 89 L.Ed. 901. In the present instance the commodore and the screen commander were certainly lawfully aboard and did, or failed to do, that which was within their authority. In these circumstances the Act considers their conduct to be their ships'. Indeed, they each had the power to control the movements of the very ships that carried them. Under the Public Vessels Act the liability of the United States is traced through the ship, and if the tactical officer's negligence is not to be ascribed to the ship, then any liability of the United States for the negligence of such officers, no matter how grave, would be put in doubt.

Finally, proctors for the Government complain of the court's refusal to direct production before trial by The Texas Company of the statements of four members of the Washington's crew, "especially when the Government's Board of Inquiry testimony had been required to be turned over to The Texas Company" and because this was a "ruling for attorney privilege and against naval privilege". They request the court "for the benefit of the record" to "note the Government's contention." It is so noted, but it is fundamentally in error. Only because the statements were the personal work product of counsel was pre-trial access to this memoranda not allowed; at the trial the Government was unrestricted in its cross-examination of these witnesses; and not the slightest prejudice

to the United States was suggested at the hearing. But as to the Government's production before trial, the fact is that nothing was "required" of it. The Court ordered discovery in precisely the terms the Government itself had offered disclosure; no more was ordered than was tendered. Further, its proctors repeatedly disclaimed any privilege—specifically, on June 2, 1954, and again on September 13, 1955.

Adopting this memorandum as its findings of fact and conclusions of law, the court will on presentation enter a decree in each of the death suits and in the limitation proceeding exonerating the Washington and The Texas Company, and will pass a decree in The Texas Company libels fixing liability upon the United States in accordance with the views herein expressed.