UNITED STATES of America, owner of THE USS RUCHAMKIN, Appellant,

v.

The SS WASHINGTON, her engines, etc., The Texas Company, etc., Appellee.

UNITED STATES of America, owner of THE USS RUCHAMKIN, Appellant,

v.

The TEXAS COMPANY, owner of the tanker Washington, Appellee.

Evelyn ECKERT, as Administratrix of the Estate of Edward James Eckert, Jr., Deceased, et al., Appellants,

v.

The TEXAS COMPANY, Appellee.

Nos. 7284–7286.

United States Court of Appeals Fourth Circuit.

Argued Nov. 16, 1956.

Decided Jan. 25, 1957.

---

2. Harvey v. American Employers' Insurance Company, 143 F.Supp. 732.

Soper, Circuit Judge, dissented in part.

Marvin Schwartz, New York City (William P. Woolls, Jr., Alexandria, Va., Betty H. Olchin, and James P. O'Connell, New York City, on the brief) for appellants in No. 7286.

Thomas F. McGovern, Atty., Dept. of Justice, Washington, D. C. (L. S. Parsons, Jr., U. S. Atty., Norfolk, Va., Leavenworth Colby, Edward B. Hayes, Admiralty Counsel, and Charles S. Haight, Jr., Attys., Dept. of Justice, Washington, D. C., on the brief) for appellant in Nos. 7284 and 7285.

Francis N. Crenshaw, Norfolk, Va. (Baird, White & Lanning, Norfolk, Va., and Joseph M. Brush, New York City, on the brief) for appellee.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and R. DORSEY WATKINS, District Judge.

PARKER, Chief Judge.

These are appeals in admiralty cases growing out of the collision between the tanker Washington of the Texas Company and the destroyer Ruchamkin, a vessel of the United States Navy, which occurred in the early morning of November 14, 1952, about 55 miles off the Virginia capes. Libels in rem and in personam were filed by the owners of both vessels against each other, and suits asking damages on account of wrongful death were filed against the Texas Company in behalf of the personal representatives of soldiers aboard the Ruchamkin who were killed by the collision. All of these cases were heard together and decrees were entered exonerating the Washington of fault, finding negligence in the operation of the Ruchamkin and entering an interlocutory decree for damages against the United States and in favor of the Texas Company. The libels filed on account of wrongful death were dismissed. See, The Ruchamkin, D.C., 141 F.Supp. 97. The United States and the death claimants have appealed. They do not contest the finding of fault on the part of the Ruchamkin nor the finding of in personam liability on the part of the United States for negligence in her navigation; but they contend that the Washington should also be held in fault in the collision. We think that this contention must be sustained.

As pointed out in the opinion below, the Ruchamkin was one of a number of naval vessels engaged in an operation off the Virginia capes. At the time of the collision, they were proceeding to a prearranged destination off Virginia Beach near Camp Pendleton and were on a course of 257 degrees. The Fremont was the guide ship of the flotilla and around her were grouped five other heavy ships in a circle with a radius of 1,000 yards. Ahead of this formation was a screen of four destroyers, the Corry, the Lloyd, the Hollis and the O'Hare. The Ruchamkin had been on a mission to pick up some soldiers and was returning to take her place in the screen of destroyers when the collision occurred.

The Washington was proceeding on a course of 7½ degrees. Although she had seen to starboard the lights of the naval flotilla which was on a course of 257 degrees, she entered the screen of destroyers passing between the Lloyd and the Hollis and avoiding collision only

because the ships of the flotilla, other than the Ruchamkin, had been slowed down from 14 to 8 and then to 5 knots per hour. The Ruchamkin was not ordered to slow down and was not told of the presence of the Washington within the screen but was ordered to "expedite" to her place in the formation and was proceeding at a speed of 22 knots per hour to her place in the screen on a course 1200 to 1500 yards north of and practically parallel with (265 degrees), the course of the northernmost of the heavy ships, the Capricornus. We think, as did the judge below, that it was negligence on the part of those in charge of the naval operation not to advise the Ruchamkin of the presence of the Washington within the screen and to bring the Ruchamkin forward at such a high rate of speed, in view of the dangerous situation existing; but we think that the Washington was in fault in failing to observe the starboard hand rule both in entering the screen and after it was entered, and was in fault, also, in failing to keep a proper lookout and in failing to take proper precautions to avoid the collision, when by the exercise of proper care it might have been avoided.

We are not impressed by the contention that those on the Washington did not know that they were approaching a naval formation at a time when they might have passed around it and avoided all danger. The lights of the flotilla were seen to starboard and were recognized by two men on lookout as naval vessels. Their number and their signalling to each other with blinker lights should have put the Washington on notice, apart from the fact that the Navy had published notice of the operation in such way that it is hardly reasonable to suppose that ships of the Texas Company were not advised of it.* The explanation that those on the Washington thought the flotilla to be a fleet of fishing vessels is not convincing, as the evidence shows that they were not displaying the sort of

lights that fishing vessels would display. Very illuminating, in this connection, is the fact that on the morning after the collision, the captain, who had been asleep at the time of the collision, gave a statement to the press that the cause of the collision was that the flotilla was navigating without lights. When asked about this at the Coast Guard investigation of the collision, he said, "but had they been carrying lights, we would have seen them; they wouldn't have enveloped up that quickly without any forewarning to us." The evidence shows that all of the ships were fully lighted, that the night was clear and that there was nothing to prevent the lights being seen.

If it be assumed that those on the Washington did not recognize the naval flotilla for what it was and that the vessel was without fault in entering the screen, she would, nevertheless, not be absolved from the duty of observing the starboard hand rule with respect to the vessels that she met. In The Oregon, 4 Cir., 175 F.2d 632, 638, we held that the rule was applicable in the case of a merchant vessel crossing the course of the vessels in a naval formation, even though the latter had been "blacked out" until shortly before the collision. If that rule had been properly observed by the Washington, it seems clear the collision here would have been avoided, notwithstanding the negligence in the navigation of the Ruchamkin. "The International Rules for Navigation at Sea" as they were at that time, are as follows:

Article 19, 33 U.S.C.A. § 104. "When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

Article 21, 33 U.S.C.A. § 106. "Where, by any of these rules, one of two vessels is to keep out of the way the other shall keep her course and speed."

* Forty copies of a Notice to Mariners covering the proposed operation had been mailed by the Coast Guard on November

10 to the Texas Company in New York and five copies to the Texas Company in Norfolk.

"Note.—When, in consequence of thick weather or other causes, such vessel finds herself so close that collision cannot be avoided by the action of the giving-way vessel alone, she also shall take such action as will best aid to avert collision."

Article 22, 33 U.S.C.A. § 107. "Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

Article 23, 33 U.S.C.A. § 108. "Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

Article 27, 33 U.S.C.A. § 112. "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Article 29, 33 U.S.C.A. § 121. "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

Notwithstanding that the second mate in charge of navigating the Washington knew that there were a number of vessels to his starboard, whose lights he could see, and that it was his duty to keep out of the way of any such vessels as might attempt to cross his course, we think it clear from the evidence that he made no proper effort to discharge his duty in this respect. The Washington was equipped with radar and he admits that he did not look at it after 2 A. M., which was fifteen minutes prior to the collision. The radar of the Fremont showed the Washington to be on a collision course with the Capricornus of the flotilla and collision was avoided only by the slowing down of the flotilla. If proper attention had been paid to the radar on the Washington, the danger of collision, not only with the Capricornus but also with the Ruchamkin, should have been seen. Furthermore, the second mate was keeping no adequate lookout. If a proper lookout had been kept, he should at least have seen the approaching lights of the Lloyd, the Newport News, the Glynn and the Capricornus, and yet he passed these vessels without observing them, although so near to them that collision with the Capricornus was averted only by the slowing of the flotilla.

If a proper lookout had been maintained, there is no reason why the approaching lights of the Ruchamkin should not have been observed well in advance of the collision. After the Washington had crossed the course of the Glynn, there is no reason why she should not have seen the approaching lights of the Ruchamkin which was speeding at 22 knots per hour as compared with the speed of 8 or 5 knots of the other vessels of the flotilla. This speed should in itself have attracted attention and at this time the Washington had reached a position where the lights of the other vessels would not be confusing, as there were no other vessels of the flotilla in the direction of the Ruchamkin except the Capricornus.

It is argued that the Capricornus shut off the view of the Ruchamkin from the Washington; but the evidence does not justify our accepting this as a fact. The Ruchamkin was on a course 1200 to 1500 yards beyond that of the Capricornus. She was traveling 22 knots as compared with 5 or 8 of the Capricornus and 14 of the Washington. The Capricornus was only 459 feet in length with a 63 foot beam; and she could have been for only a very brief space of time in the direct line of vision between the Washington and the Ruchamkin, and even for this brief period there is no reason why the white mast and range lights should

not have been seen and noticed, especially as they were moving at such an unusual speed. The lookout on the Washington, one Upton, testified at the Coast Guard hearing that he did indeed notice them ten minutes before the collision and twice reported them to the bridge by ringing a bell. This testimony is corroborated by the helmsman, who testifies that he heard the bell; and we see no reason why it should not be accepted, as it is entirely reasonable and was given shortly after the collision at the Coast Guard hearing. The mate testifies that he paid no attention to the bell signals from the lookout because he was in position to see and judge of the lights better than the lookout. Whether the testimony of Upton is accepted or not, we think it clear that if a proper lookout had been maintained by the mate, the Ruchamkin would have been discovered in ample time to have avoided the collision. "The ship will be held in fault if the lookout fails to see or hear what, if he had given heed, he should have seen or heard." Robinson on Admiralty p. 814. The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126; The Colorado, 91 U.S. 692, 699, 23 L.Ed. 379. As said in the case last cited:

> "Lookouts are valueless unless they are properly stationed, and vigilantly employed in the performance of their duty; and if they are not, and in consequence of their neglect the approaching vessel is not seen in season to prevent a collision, the fault is properly chargeable to the vessel, and will render her liable, unless the other vessel was guilty of violating the rules of navigation."

Even if the Ruchamkin had not been discovered until the course of the Capricornus had been crossed, there is no reason why the collision might not have been avoided in the exercise of reasonable care on the part of the Washington. Several minutes elapsed between that time and the time necessary to cover the twelve or fifteen hundred yards of distance before the course of the Ru-

chamkin could be reached; and, in this time, the engines could have been reversed, an alarm sounded on the whistle and the course of the vessel changed so as to avoid collision. If nothing had been done but reverse the engines, the collision would have been avoided, as the Ruchamkin nearly cleared the Washington as it was, being struck well abaft her beam. A slight slowing up of the Washington, with a delay of only a few seconds in reaching the crossing course, would have enabled the Ruchamkin to have crossed in safety. The evidence is that those on the Ruchamkin allowed some time to elapse without doing anything after the Washington was seen by them. Their excuse for this delay was that they thought that the Washington was one of the ships of the flotilla. The Washington should have seen the Ruchamkin as soon as the Ruchamkin saw her and she could not have been misled as to the danger. Certainly, when she crossed the course of the Capricornus, she should have realized the danger presented by the oncoming Ruchamkin and should have taken instant steps to keep out of her way. This she did not do, manifestly because a proper lookout was not being kept, as the mate testifies that the crash came within thirty seconds of his sighting the Ruchamkin. The whistle was not blown until the vessels were in collision. Such negligence cannot be excused as error in extremis. As said in Cuba Distilling Co. v. Grace Line, 2 Cir., 143 F.2d 499, and quoted by us in The Oregon, supra: " * * * men, charged with responsibilities of command, must not be wholly incapacitated for sound judgment when suddenly thrust into peril. Part of their equipment for their duties is some ability to think, be the situation ever so sudden and so grave."

Other negligence in the operation of the Washington was failure to sound her whistle when changing course. When passing between the Lloyd and the Hollis, she changed her course 14 degrees to starboard and, after she had passed be-

tween these vessels, went back on the original course without sounding her whistle as required by the rules at the time of either change. By that time, at least, the Washington should have realized that she was within the screen of the naval formation and should have followed the rules strictly, not only for the sake of the vessel which she was seeking to avoid, but also for the sake of advising the other vessels of the flotilla of what she was doing. If, however, regard be had only to the Ruchamkin, a proper lookout would have advised the Washington, as we have seen, that she was on crossing courses with that vessel and that the warning signal should be given for her benefit.

Since both the Ruchamkin and the Washington were at fault, the damages resulting from the collision should be divided equally between them so that one-half shall be borne by the Texas Company and one-half by the United States, and this applies to the in personam as well as to the in rem liability. The Texas Company argues that there is in rem liability on the part of the Fremont and the Hollis, as the Task Commander directing the entire flotilla was aboard the Fremont and the Screen Commander directing the destroyers was aboard the Hollis. The argument is that negligence in ordering the Ruchamkin to expedite to her position in the screen and in not warning her of the presence of the Washington was a contributing cause of the collision, and that the vessels carrying the Task Commander and the Screen Commander are liable in rem for their negligence in this regard. The judge below expressed an opinion to this effect although the question was not reached in the decision which he rendered. If this position can be sustained, it will result that although the Washington was the burdened vessel and was at least as much if not more to blame for the collision than the Ruchamkin, the United States will have to bear three-fourths of the damage resulting from the collision and the Texas Company only one-fourth

merely because the fleet officers were located on vessels other than the Ruchamkin. We do not think that the position can be sustained or that any such result is required. The Ruchamkin was not operating under the direction of any other vessel or the officers of any other vessel. She sustained the same relationship to the Task Commander as did other vessels of the flotilla and the same relationship to the Screen Commander as did the other destroyers in the screen. Other vessels of the flotilla were no more liable for her fault caused by negligence in the directions of these officers than if the officers had been issuing the orders from land or from an aeroplane.

It is well settled, of course, that where vessels operating together are at fault in a collision, each is responsible in rem for its proportionate part of the damage even though they belong to the same owner. The Eugene F. Moran, 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600. It is equally well settled, however, that notwithstanding common ownership, in rem liability exists only with respect to a vessel which is at fault in the collision. Liverpool, Brazil & River Platt Steam Nav. Co. v. Brooklyn Eastern Dist. Term, 251 U.S. 48, 40 S.Ct. 66, 64 L.Ed. 130; Sacramento Nav. Co. v. Salz, 273 U.S. 326, 332, 47 S.Ct. 368, 71 L.Ed. 663. If a vessel in collision is in control of another vessel or its commanding officer, the latter is held to in rem liability, if in fault, on the ground that it controlled the ship in collision. This is the basis of liability in United States v. The Australia Star (The Hindoo), 2 Cir., 172 F. 2d 472, relied on by the Texas Company, where a convoy was subject to the orders of an escort vessel. It is the basis of liability, also, in the case of the Canadian Aviator, Ltd. v. United States, 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901, where the injured vessel was under the direct control of the vessel held liable, which was guiding the injured vessel through dangerous waters. Here the Ruchamkin was not subject to the control of either the Fremont or the Hollis,

or the Officers of those vessels, but of the Task Commander and the Screen Commander who had taken stations on them, but for whose orders those vessels were no more responsible than if the officers had been stationed on other vessels or, as has been said, than if the officers had been issuing the orders from land or an aeroplane.

Very much in point is the case of Publicover v. Alcoa S. S. Co., 2 Cir., 168 F.2d 672, 675, 678. In that case there was a collision between a schooner and a steamship, the Alcoa Pilot, which was one of a convoy of vessels. The commodore of the convoy was master of another vessel, the Cyrus Field. It was attempted to hold the Cyrus Field to liability for alleged failure of the commodore to do his duty in his capacity as commodore. In holding the Cyrus Field not liable, the court, speaking through Judge Learned Hand, said:

"Finally, even though we were to press the liability of the 'Cyrus Field' as a fictitious jural person, she was not at fault; she did not contribute to the collision. The hypothesis is that it was the failure of the commodore to take charge of the 'Alcoa Pilot's' navigation which was the fault."

See also The Glaucus and City of Florence 1948 Law Reports (Eng.) Probate Division 95; The Sobieski 1949 Law Reports (Eng.) Probate Division C.A. 313.

■ One other point raised by the appeal may be dismissed with brief mention. The government complains that it was an abuse of discretion on the part of the trial judge not to require counsel for the Texas Company to produce statements of witnesses taken by counsel when the production, with certain security precautions, of evidence taken at the Naval Court of Inquiry was ordered in accordance with the practice approved by this court in The Oregon, 4 Cir., 175 F.2d 632. This was a matter resting very largely in the discretion of the trial judge, who had to decide to what extent the statements made to counsel were privileged. We cannot see that the discretion was abused or that the case of the government was in any way prejudiced, as counsel for the government were given full opportunity to examine and cross examine the witnesses whose statements they requested.

For the reasons stated, the decrees appealed from will be reversed in so far as they absolve the Washington and the Texas Company from liability, but affirmed in so far as they establish liability on the part of the United States for the fault of the Ruchamkin; and the cases will be remanded to the court below for further proceedings not inconsistent herewith.

Affirmed in part, reversed in part, and remanded with directions.

SOPER, Circuit Judge (dissenting in part).

In my view the flagships as well as the Ruchamkin should be held liable for the collision. They furnished the necessary stations for the Task and Screen Commanders who controlled the whole operation, they supplied the means and the men by whom the movements of the Ruchamkin were directed and hence were participants in the accident. See United States v. The Australia Star, 2 Cir., 172 F.2d 472; Canadian Aviator v. United States, 324 U.S. 215, 65 S.Ct. 639, 89 L.Ed. 901; Publicover v. Alcoa S.S. Co., 2 Cir., 168 F.2d 672, 678. On this point I am in accord with the conclusions of Judge Bryan as set out in his opinion in the District Court.